UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK RUSSELL ROBERTS,

                 Plaintiff,                       Civil Action No. 10-cv-14064

        v.                             District Judge Nancy G. Edmunds
                                       Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [7,12]**

       Plaintiff Mark Russell Roberts ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 7, 12) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkts. 2, 9).

**I.  RECOMMENDATION**

       For the reasons set forth below, this Court finds that the Administrative Law Judge's decision to deny benefits is supported by substantial evidence.  Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff alleges that he became unable to work on February 15, 1999. (Tr. 101-103, 106-108.) The Commissioner denied Plaintiff's disability application on July 17, 2006. (Tr. 59-63, 64-67.) Plaintiff then filed a request for a hearing, and on December 10, 2008, he appeared with counsel before Administrative Law Judge ("ALJ") Ayrie Moore, who considered the case *de novo*. (Tr. 25-54.) In a February 3, 2009 decision, the ALJ found that Plaintiff was not disabled. (Tr. 19.) The ALJ's decision became the final decision of the Commissioner on August 6, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff filed this suit on October 11, 2010.

### B. Background

Plaintiff was forty-nine years old at the time of the ALJ's decision. (Tr. 28.) He has a high-school education. (*Id.*) Plaintiff's previous work experience is in the building construction industry. (Tr. 31, 44.)

#### 1. Plaintiff's Testimony

At the December 10, 2008 hearing before the ALJ, Plaintiff testified to pain in his heels, right ankle, and hip. (Tr. 31-32.) Plaintiff testified to no other source of physical limitations. (Tr. 32.) Plaintiff suffered a shattered hip when he was hit by a car on September 18, 2006, and he crushed both of his heels, right ankle, and right leg in other incidents on February 15, 1999 and August 5, 1999. (Tr. 32, 226, 237.) Regarding his mobility, Plaintiff explained that he can walk around, but did not consider himself completely healed. (Tr. 32.) Plaintiff testified that he can move around for short periods of time and needs a cane to walk, unless he is only walking short distances.

2

(Tr. 32, 35.) In addition, Plaintiff explained that sitting can cause discomfort, and that sometimes he has to lie in bed during the day to relieve the discomfort. (Tr. 32.) Plaintiff testified to consulting with a physician approximately once or twice a year regarding these impairments, as well as receiving pain medication from the physician at these visits. (Tr. 34.) Aside from attempting to limit his movements, Plaintiff took no other action to alleviate his pain since January 2007. (*Id.*)

Plaintiff admitted to drinking alcohol and testified to having a small drinking problem, but claimed he did not drink every day, stating that it would "cost [him] a fortune." (Tr. 36.) Despite Plaintiff's alcohol problem, he testified that it did not result in any problems in terms of memory or thought-processing. (*Id.*) However, Plaintiff claimed to have memory problems as a result of an "anxiety attack." (Tr. 37.) This "anxiety attack" was an isolated incident. (Tr. 35.) Plaintiff's only persisting pain is from his hip and ankles. (*Id.*)

When asked how long he could sit at a time, Plaintiff testified that he could sit for a "[c]ouple of hours, maybe three." (Tr. 38.) When asked about standing and walking, Plaintiff testified that he could stand and walk for about a half hour to an hour. (*Id.*) The ALJ asked Plaintiff if he had problems concentrating. (Tr. 39.) Plaintiff responded that he "sometimes" had problems concentrating, but could not explain the cause of his concentration problems. (*Id.*) Plaintiff explained that he could be reading something and forget what he previously read. (*Id.*)

Plaintiff lives alone in an apartment. (Tr. 29.) He cooks himself meals and takes care of all his own personal needs. (Tr. 40.) He maintains his apartment without the assistance of others. (*Id.*) While he does not do his own laundry or handle his own finances, he folds his laundry, takes out his trash, cleans his bathroom, and shops for food on his own. (Tr. 29, 41, 53.) For recreation, Plaintiff watches television, visits friends, and enjoys playing cards and bingo. (Tr. 41-42.) He gets along

3

with friends, neighbors, and co-workers.  (Tr. 42.)

     *2. Medical Evidence*

Plaintiff has suffered an unfortunate string of accidents. On February 15, 1999, Plaintiff slipped off a roof and landed directly on his heels.  (Tr. 247.)  Due to this accident, Plaintiff broke both calcanei (i.e., heel bones). (Tr. 236.) A March 3, 1999 exam demonstrated extensively comminuted fractures involving the mid and distal body of both the right and left calcaneus. (Tr. 240.) Plaintiff wore a cast for approximately two months after this roofing accident.  (Tr. 236.)  An April 13, 1999 exam showed that Plaintiff was healing from the fall.  (Tr. 240.)

Approximately six months later, on August 5, 1999, Plaintiff broke his right distal tibia/fibula.  (Tr. 227.)  Plaintiff was spraying for bees and fell off two feet of scaffolding.  (*Id.*) Plaintiff had a blood-alcohol level of 0.31 at the time of the accident, but denied having any drinking problem even though he stated that he does drink six to eight beers approximately three times a week.  (*Id.*)  At an August 31, 1999 examination, the examining doctor noticed that Plaintiff's cast was completely worn due to excessive walking.  (Tr. 210.)  By November 1999, Plaintiff's left distal tibia was healing well, and Plaintiff was walking without a brace or an assistive device.  (Tr. 203.)

Throughout the beginning of 2000, Plaintiff participated in physical therapy due to his calcaneal fractures.  (Tr. 192, 196, 199.)  As of February 23, 2000, treatment was somewhat effective and improvement was noticeable.  (Tr. 199-200.)  However, as of March 3, 2000, Plaintiff's response to treatment was unknown, and Plaintiff did not meet therapeutic goals. (Tr. 192-193.)  Plaintiff's fractured calcanei were healing, but arthritic changes occurred in the subtalar joint,

resulting in pain. (Tr. 190.)  As a result, Plaintiff underwent a subtalar fusion[1] of the left foot on May 16, 2000.  (*Id.*)  On May 30, 2000, Plaintiff received  a short-leg walking cast, and x-rays showed good signs of early fusion.  (Tr. 186.)  Five weeks later, on July 6, 2000, Plaintiff decided to no longer wear a cast and used a brace instead. (Tr. 184.)

Unrelated to any of the aforementioned injuries, Plaintiff sought medical attention on February, 2, 2001, and April 11, 2001, for chest pain. (Tr. 159, 171.)  Plaintiff was released without the performance of any procedure.  (Tr. 160, 172.)  Plaintiff admitted to smoking one and a half to two packs of cigarettes per day, drinking six to twelve beers per day, and drinking ten cups of regular coffee per day.  (Tr. 159.)  Before discharge, Plaintiff was notified of his risk factors, particularly his smoking habit.  (Tr. 160.)

Robert Plummer, Ph.D., performed a psychological evaluation of Plaintiff on November 12, 2004, in order to assess Plaintiff's ability to work.  (Tr. 377.)  In response to a question from Dr. Plummer, Plaintiff stated that he did not have trouble paying attention, but did have trouble with memory. (Tr. 378.)  He writes things down in order to remember them later. (*Id.*)  According to the intellectual evaluation section of the psychological evaluation, there was evidence of a moderate cognitive dysfunction, but such dysfunction did not preclude occupational tasks. (Tr. 382.) Consistent with Plaintiff's claimed memory trouble, Plaintiff scored low in many categories of the memory evaluation portion of the exam.  (Tr. 383.)  Dr. Plummer stated that Plaintiff is able to concentrate on important tasks, but had a tendency to neglect those he considered unimportant.  (Tr.

---

[1]The procedure involved an incision down to the subtalar joint.  The lateral aspect of the talus was removed, and a large amount of cancellous bone graft was harvested.  A guide-wire was placed through the neck of the talus down to the calcaneus.  A bone graft was then placed throughout the subtalar joint, and a compression screw was tightened into position. (Tr. 190.)

384.)  Dr. Plummer also found that Plaintiff had little energy for tasks he considered unimportant, had trouble seeking out new interests, and, therefore, possessed a low ability to concentrate and make decisions.  (*Id.*)  In conclusion, Dr. Plummer found moderate cognitive impairment, but not to the extent to preclude Plaintiff's eventual, successful occupational performance.  (Tr. 385.)  In his prognosis, however, Dr. Plummer did not specifically describe the types of tasks Plaintiff would be able to complete. (*Id.*)

In June 2006, Dr. Donald Cady examined Plaintiff for a disability determination.  (Tr. 261.)  Dr. Cady concluded that Plaintiff had a full range of motion in his upper extremities and a good range of motion for the hips and knees.  (Tr. 262-263.)  According to Dr. Cady, Plaintiff could work with his physical limitations.  (Tr. 263.)  Additionally, Dr. Cady concluded that a psychological evaluation would be valuable.  (*Id.*)

Mark Zaroff, Ph.D., prepared a psychological report based upon a July 12, 2006 evaluation.  (Tr. 268.)  Plaintiff did well during the mental status evaluation and interview, exhibiting no signs of significant short-term memory impairment. (Tr. 272.)  Dr. Zaroff was of the opinion that any memory impairment was most likely due to anxiety, depression, and general boredom, as one day was not distinguishable from another for Plaintiff.  (*Id.*)  Dr. Zaroff gave a fair prognosis and concluded that Plaintiff was able to manage his own funds, despite  Plaintiff's claim to the contrary.  (*Id.*)

Based upon a July 14, 2006 residual functional capacity assessment signed by Medical Consultant Julie Ingersoll, Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently.  (Tr. 274.)  In addition, Plaintiff could stand and/or walk at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday.  (*Id.*)  Along with a limited ability

to push and/or pull in his lower extremities, Plaintiff had limitations in climbing, balancing, kneeling, crouching, and crawling. (Tr. 275.)

In a July 16, 2006 psychiatric review, Dr. Joe DeLoach, Ph.D., concluded that Plaintiff suffered from adjustment disorder with mixed anxiety and a depressed mood. (Tr. 284.) Dr. DeLoach found no restrictions in activities of daily living; mild difficulty in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 291.) As a result, performance of sedentary, unskilled jobs, such as a food and beverage order clerk, were found to be within Plaintiff's ability. (Tr. 57.)

Plaintiff visited Dr. Plummer a second time in March 2007 for a mental residual functional capacity assessment. (Tr. 371.) According to this assessment, Plaintiff was not significantly limited in carrying out simple instructions, but Plaintiff was moderately limited in maintaining attention and concentration for extended periods, and markedly limited in the ability to carry out detailed instructions and sustain an ordinary routine without supervision. (*Id.*) However, under the "Mental Status" heading, Dr. Plummer wrote that Plaintiff's attention and concentration evidenced no significant dysfunction, and his ability to retain mental control was within normal limits. (Tr. 374.) Dr. Plummer concluded that Plaintiff suffered from a moderate to severe cognitive impairment, and required the assistance of a guardian. (Tr. 376.) Additionally, Dr. Plummer was of the opinion that Plaintiff was more labile and impulsive than during his 2004 evaluation. (*Id.*) Finally, Dr. Plummer opined that Plaintiff continued to have below normal memory function and gave Plaintiff a poor prognosis. (*Id.*)

In addition to Plaintiff's previous injuries, Plaintiff was struck by a motor vehicle on September 18, 2006. (Tr. 327.) Plaintiff suffered a right hip fracture as a result of the accident, and

7

has continued pain in his hip.  (Tr. 32, 329.)

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Linda Gels, who has more than thirty years of experience, testified at the hearing.  The ALJ asked the VE to assume the following hypothetical individual:

> [one who] can lift, lift up to 10 pounds frequently, and 20 pounds occasionally; but not standing more than two hours; and no constant pushing or pulling with his legs; and postural limitations, all of them can be occasional, except he can do no ladders. . . . And he should have no concentrated exposure to work hazards and vibration. [B]ecause of pain, . . . he can only do simple, routine, repetitive work.

(Tr. 45.)  The VE testified that this person could not do any of the Plaintiff's past work as a construction worker.  (Tr. 45.)  The ALJ then asked the VE to assume the hypothetical applied to an individual the same age as the claimant with the same education and work experience.  (Tr. 45.)  In response, the VE testified that such a person could perform sedentary unskilled work.  (Tr. 46.)  The VE stated that about 4,000 unskilled sedentary jobs existed statewide.  (Tr. 47.)

Further, the ALJ asked the VE if a sit/stand option, if needed, would reduce the ability to sustain concentration, persistence, and pace.  (Tr. 47.)  The VE testified that a sit/stand option would not significantly affect persistence and pace.  (Tr. 48.)  According to the VE, a person with a sit/stand option could maintain persistence and pace ninety-percent of the time.  (*Id.*)  "[N]o one's 100 percent, so there's always some give." (*Id.*)  This ten-percent reduction in persistence and pace, according to the VE, would have no impact on job availability or performance.  (Tr. 48-49.)

While including all previous limitations, the ALJ inquired about an individual's ability to do his job if he needed to shift positions.  (Tr. 49.)  The VE presumed that shifting positions was transitioning from standing to sitting or vice versa.  (*Id.*)  Further defining the sit/stand criteria, the ALJ stated that an individual needed to stand no more than two hours a day and sit six hours a day.

8

(Tr. 50.)  The person could shift between standing and sitting, but the totals for the day are two and six hours respectively.  (*Id.*)  According to the VE, the vast majority of jobs would not require sitting more than six hours, but there were some occupations that might require sitting for more than six hours per day.  (*Id.*)  In addition, the VE testified that an individual could shift between standing and sitting without affecting job performance.  (Tr. 50-51.)

Upon examination by Plaintiff's counsel, the VE testified that work would be precluded if an individual's concentration, persistence, or pace were affected because of pain or cognitive disorder twenty-percent of the time, such that he was nonproductive or off task.  (Tr. 52.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'"  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 19, 2006 – Plaintiff's application date. (Tr. 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: status post crush injury to left ankle, ethyl alcohol abuse, hypertension, and affective disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 18-19.) In examining the B criteria associated with mental impairments, *see* 20 C.F.R. pt. 4040, subpt. P, app'x 1, § 12.04, the ALJ found that Plaintiff had mild restrictions in daily living; mild difficulties in social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 18-19.) In addition, the ALJ concluded that the evidence failed to establish the presence of the paragraph C criteria. (Tr. 19.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform a limited range of

10

sedentary work that included, among other restrictions, work involving only simple, routine, and repetitive tasks. (Tr. 19-22.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 22.) At step five, the ALJ relied on VE testimony in response to her hypothetical and follow up questions and found that work existed in significant numbers that Plaintiff could perform. (Tr. 22-23.) These jobs include 4,000 bench work positions in the State of Michigan. (Tr. 23.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court

11

"may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston* v. *Comm'r of Soc. Sec.*, 245 F.3d, 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

## F.  Analysis

Plaintiff contends that the ALJ (1) formed an inaccurate hypothetical because it did not include Plaintiff's moderate concentration, persistence, or pace impairment, (Dkt. 7, Pl.'s Mot. Summ. J. at 6.); and (2) failed to properly evaluate all the medical records and opinion evidence. (Dkt. 7, Pl.'s Mot. Summ. J. at 14.)  The Court disagrees with these assignments of error.

### 1. *Substantial Evidence Supports the ALJ's Decision*

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Plaintiff's primary argument is that the ALJ's hypothetical – which included the limitation of "simple, routine, repetitive work" – did not

12

accurately portray Plaintiff's mental impairments because it did not account for his "moderate" deficiencies in maintaining concentration, persistence, or pace.  (Dkt. 7, Pl's Mot. Summ. J. at 6.) This assignment of ALJ error – that hypothetical limitations such as "simple," "routine," and "repetitive" fail to account for moderate concentrational deficiencies — is not uncommon and the case law resolves it both ways.  There are cases ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks[2]— but also other cases that have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.[3]

_____

[2] *See e.g.*, *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007) ("Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations."); *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("In the present case, while finding that Plaintiff is 'moderately limited with concentration, persistence, and pace,' [the ALJ's] only limitations were with co-workers and the public, and to "unskilled, light jobs."  These parameters are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE. Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at an unskilled job." (internal citations omitted)); *Long v. Comm'r of Soc. Sec.*, No. 09-14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) ("In the present case, the ALJ gave Plaintiff the mental limitation for 'simple unskilled work.' However, the ALJ also determined that 'with regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties.'  The ALJ did not incorporate [that] limitation . . . into the controlling hypothetical.  This was error." (internal citations omitted)); *Perkins v. Comm'r of Soc. Sec.*, No. 10-10089, 2010 WL 5634379, at *9 (E.D. Mich. Dec. 14, 2010) (same).

[3] *See e.g.*, *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations . . . are not incompatible."); *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. Apr. 20, 2009) ("The Law Judge's hypothetical questions to the Vocational Expert accurately described Plaintiff's moderate limitations caused by her depressive disorder.  There is no merit to Plaintiff's argument that the ALJ should have included a limitation

In analyzing this case law, the Court agrees that a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task does not always equate with the difficulty of staying on task. *See e.g.*, *Green v. Comm'r of Soc Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005). However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of simple, routine and repetitive work, but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision. *See Davis v. Apfel*, 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001) (a "substantiality of the evidence evaluation does not permit a selective reading of the record.").

Indeed, in a similar case, another court in this District explained:

> Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible.

*Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

In *Hess*, the state agency doctor found that the claimant suffered moderate limitations in

---

that she had moderate limitations in maintaining concentration, persistence or pace. Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

14

concentration, persistence, and pace, such that the claimant had limitations in performing at a consistent pace. *Hess*, 2008 WL 2478325, at *7. However, the doctor ultimately concluded that the claimant retained the ability to perform unskilled tasks on a sustained basis. *Id.* at *4. The court in *Hess* concluded that because the ALJ relied on the state doctor's finding of a moderate impairment with concentration, persistence or pace, it was reasonable for the ALJ to also rely on the doctor's ultimate conclusion that the claimant could perform unskilled work on a sustained basis, and, accordingly, to omit a concentration-based limitation from the hypothetical. *Id.* at *8. "Plaintiff's argument for the selective adoption of Dr. Marshall's 'moderate' limitations without considering his ultimate conclusion would amount to a distortion of the record." *Id.* at *8. The court continued, "Likewise, Dr. Marshall's observation that Plaintiff experienced a moderately impaired ability to be punctual and complete her work without psychologically based interruptions must be analyzed alongside his conclusion that Plaintiff was capable of a limited range of work." *Id.*; *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("The psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work.").

As in *Hess* and *Lewicki*, this Court believes that the ALJ's finding of a moderate limitation in concentration, persistence, or pace has to be considered in conjunction with the medical experts' conclusions, and other evidence, that suggests Plaintiff could successfully perform occupational tasks. (Tr. 57, 263, 272, 376, 385.)

For example, Dr. Plummer first performed a psychological evaluation of Plaintiff on November 12, 2004 in order to assess Plaintiff's ability to work. (Tr. 377.) While he found that Plaintiff had a moderate cognitive impairment, he also found that it was not to the extent to preclude Plaintiff's eventual, successful occupational performance. (Tr. 385.) Dr. Plummer further opined

that Plaintiff did not significantly change between his 2004 and 2007 evaluations.  (Tr. 376.)  His finding that Plaintiff suffered from more frequent irritations, remarks, or verbal outbursts in 2007 than in 2004, is seemingly unrelated to Plaintiff's ability to perform repetitive, sedentary work.

During Dr. Zaroff's July 12, 2006 evaluation, he found that Plaintiff did well during the mental status evaluation and interview, exhibiting no signs of significant short-term memory impairment  (Tr. 272), and gave Plaintiff a fair prognosis.  A few days later,  Dr. DeLoach performed a psychiatric review of the Plaintiff. (Tr. 281.) Dr. Deloach opined that Plaintiff suffered mild difficulties maintaining concentration, persistence, or pace, but  ultimately concluded that Plaintiff was capable of performing sedentary, unskilled jobs, such as a food and beverage order clerk.  (Tr. 57, 291.)  Accordingly, the ALJ's hypothetical was consistent with these medical conclusions.  *See Latarte*, 2009 WL 1044836, at *3 ("Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); S.S.R. 85-15, 1985 WL 56857, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").

It is also worth noting that another medical expert, Dr. Cady, examined Plaintiff and concluded that Plaintiff could work despite his physical limitations.  (Tr. 263.)  It also appears that the ALJ was seeking to make sure she adequately accounted for Plaintiff's limitations  by specifically discussing with the VE a sit/stand option and its possible reduction of concentration, persistence, and pace. (Tr. 47-51.)  In sum, considering the record in its entirety, substantial evidence supports the ALJ's hypothetical.

The cases upon which Plaintiff relies are distinguishable.  For example, in *McGuire v. Apfel*,

16

No.98-1302, 1999 WL 426035, at *15 (D. Or. May 11, 1999), there was evidence suggesting that the claimant performed at half the pace of a normal person. The ALJ failed to discuss this limitation with the VE and also failed to explain why he did not include it in the RFC. (*Id.*) In *Newton v. Chater*, 92 F.3d 699, 690 (8th Cir. 1996), two doctors found that the claimant suffered from a moderate impairment in concentration, persistence, or pace, which, unlike Plaintiff here, resulted in the claimant's inability to complete tasks in a timely manner, maintain concentration for extended periods, perform at a constant pace, complete a normal work week, maintain regular attendance, and maintain punctuality. *Id.* at 690, 695. The only case law from this District that Plaintiff cites is *Thomczek v. Chater*, No. 94-74011, 1996 WL 426247, at *2 (E.D. Mich. Jan. 5, 1996), in which the court, in a cursory manner, found that because the ALJ did not include the claimant's inability to concentrate in the hypothetical, the hypothetical was inaccurate. *Id.* at *2-3. This case pre-dates *Hess* (2008) and *Latarte* (2009) and Plaintiff offers no explanation for why it should control on this record.

### 2. *The ALJ Properly Evaluated all of the Medical Records and Opinions*

Plaintiff contends that the ALJ erred by failing to properly evaluate all the medical evidence and opinions. (Dkt. 7 Pl's Mot. Summ. J at 14.) Specifically, Plaintiff asserts that the ALJ failed to properly take into consideration the 2004 and 2007 evaluations by Dr. Plummer. (Dkt. 7 Pl's Mot. Summ. J. at 14-16.) While not explicitly stated in Plaintiff's brief, it can be inferred that he is arguing Dr. Plummer is a treating physician. (Dkt. 7 Pl's Mot. Summ. J. at 14, citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).)

Under the applicable regulations, greater deference is given to the opinions of a treating physician than to those of a non-treating physician; this is commonly known as the treating physician rule. *See* SSR 96-2P; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

17

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not inconsistent with the other substantial evidence in [the] case record.'" *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).   As a threshold matter, however, Dr. Plummer was not Plaintiff's treating physician.

A treating physician is defined by the regulations as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and *who has, or has had, an ongoing treatment relationship with you*."   20 C.F.R. § 404.1502 (emphasis added).   As the Sixth Circuit explained in *Kornecky v. Comm'r Soc. Sec.*, 167 F. App'x. 496 (6th Cir. 2006):

> "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ." *Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994)* ("Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here.").
>
> [Plaintiff] cites no authority where a federal court has found a source to be a treating source after only one visit. However, a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship.  *See, e.g., White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005)* (occupational medicine specialist who evaluated claimant only once was not a treating physician).  Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship. *See, e.g., Cunningham v. Shalala, 880 F. Supp. 537, 551 (N.D. Ill. 1995)* (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight).

*Id.* at 506-07.

The record here suggests that the entirety of Plaintiff's "relationship" with Dr. Plummer

consisted of two visits – an initial evaluation in November 2004 and a psychiatric evaluation three years later in March 2007. (Tr. 371, 377.) The November 2004 visit was a referral for psychological evaluation to assess Plaintiff's ability to work considering his claimed disability (Tr. 377) , while the 2007 evaluation simply a mental residual functional capacity assessment. (Tr. 371.) There are no treatment notes from Dr. Plummer. Because Dr. Plummer was not Plaintiff's treating physician, the ALJ did not err in failing to accord controlling weight to his opinions.

Notwithstanding the (lack of) applicability of the treating physician rule, the ALJ did explain her treatment of Dr. Plummer's evaluations. With regard to the 2004 report, the ALJ noted "[o]ne opinion of record involves the period before the application date (see 10F)." (Tr. 22.) Plaintiff was not eligible for SSI benefits before January 19, 2006 – the date Plaintiff filed his SSI application. (Tr. 15.); *see* 20 C.F.R. § 416.335. Moreover, while not explicitly referenced, the ALJ credited, to some extent, Dr. Plummer's 2007 opinion. *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. Sept. 30, 2010) ("Neither the ALJ nor the [Appeals] Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reached a reasoned conclusion."); *Kornecky*, 167 F. App'x. at 507-08 ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"). Like Dr. Plummer, the ALJ determined that Plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods. (Tr. 18.) Other portions of Dr. Plummer's evaluation, however, were inconsistent with other evidence and testimony that the ALJ had to consider. For example, Dr. Plummer was of the opinion that Plaintiff needed the assistance of a guardian and in understanding financial and legal matters. (*Id.*) But Dr. Zaroff opined that Plaintiff had the ability to manage his own funds. (Tr. 272.) Plaintiff likewise

19

testified that he lives alone, cooks for himself, takes care of all his own personal needs and maintains his apartment without the assistance of others. (Tr. 29, 40.)

The ALJ's opinion makes clear that she considered the record evidence pertaining to Plaintiff's mental impairments and structured her residual functional capacity analysis accordingly.[4]

### G. Conclusion

For the foregoing reasons, this Court finds that the opinion of the Administrative Law Judge is supported by substantial evidence. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service

---

[4] Plaintiff also mentions a Medical Needs Form that he apparently filled out – there is no visible signature of any medical professional. It does not appear to have anything to do with mental limitations.

of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/      Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: August 8, 2011


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 8, 2011.


s/Jane Johnson
Deputy Clerk